J-A13028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JULI J. CLAYCOMB | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRENT A. RHODES | : | |
| | : | |
| Appellant | : | No. 975 WDA 2024 |

Appeal from the Order Entered July 14, 2024
In the Court of Common Pleas of Blair County Domestic Relations at
No(s):  Docket Number: 1500597,
PACSES Case Number: 971111152

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY OLSON, J.: **FILED: July 22, 2025**

Appellant, Brent A. Rhodes ("Father"), appeals from the July 14, 2024 order entered in the Court of Common Pleas of Blair County, increasing Father's child support obligation to Appellee, Juli J. Claycomb ("Mother"), for the parties' minor child, A.J.C., age 15 ("the Child").  We affirm.

Father and Mother never married.  Father and Mother share physical and legal custody of the Child 50/50.  Mother is a teacher, earning an annual salary of $61,149.00.  Father is the owner and sole shareholder of Northeastern Equipment & Supply Company, LLC, a niche business wherein he sells hydraulic components.

Since approximately 2010, Father paid $450.00 a month to Mother as child support.  On May 21, 2021, however, Mother filed for modification of the aforementioned support order.  "On September 2, 2021, after [a support]

conference, Father was directed to pay $461[.00]/month based upon Mother's [monthly] income of $3,440.00 and Father's [monthly] income of $4,227.79, which he indicated he based on his 2019 tax return." Trial Court Opinion, 5/31/24, at 1. Mother appealed, seeking an evidentiary hearing and a trial court determination regarding the amount of support owed. The parties then engaged in discovery for two years.

On May 14, 2024, the trial court convened a hearing wherein Mother, Father, and Father's accountant, Bernard Creppage, testified. There was no dispute over Mother's net income. Instead, the parties focused on Father's income. The trial court issued the following findings-of-fact based upon the testimony and evidence presented during the May 14, 2024 hearing.

1. Father operates a niche company (Northeastern Equipment & Supply Co. LLC) that deals with hydraulic components, which are used, at this point, in the gas and oil [industry]. He has begun diversifying [into the field of water drilling due to reduced demand for services in the oil and gas field].

2. Father has operated this company for 17 years.

3. The company is structured as a sole proprietorship and Father exercises total control over the business.

4. The company maintains an account at Investment Savings Bank [("ISB")] and statements were entered as [Mother's E]xhibits 9, 10, and 11.

5. Tax returns for [Father] were entered as [Father's] Exhibits 1, 2, and 3 for tax years 2021, 2022 and 2023.

6. Father's accountant prepared a [three]-year comparison of disposable net income or net cash flow from the business ([Father's] Exhibit 4) indicating net cash flow for

   a. 2021 - $6,482.00

b. 2022 - $16,873.00

c. 2023 - $7,422.00

Before payment of debt, the adjusted cash flow for the business was:

a. 2021 - $42,300.00

b. 2022 - $52,691.00

c. 2023 - $30,544.00

7. Father owns a marital residence valued at $277,000.00 (debt of $126,000.00) [at an address along] Robinson Ave[nue in] Roaring Spring, [Pennsylvania].

8. Father owns a business building valued at $54,000[.00] (no debt) located [along] Agway Drive [in] Martinsburg[, Pennsylvania].

9. Father owns a resort property valued at $675,000.00, purchased in 2019 with a promissory note in the amount of $461,000.00, which debt is current on payments as [the court] did not hear otherwise, so the debt has decreased over the last [five] years. This property is located at Raystown Lake, Huntingdon County PA, and is primarily used as a rental.

10. Father drives a 2016 [four] door Silverado truck. His wife drives a Cadillac Escalade.

11. Father also makes payments on a 2015 Silverado truck for his father to drive for the business. [The trial court] did not hear testimony that this truck is exclusively used solely for business purposes.

12. Father has a business checking account with [ISB] which he testified he has maintained for 17 years[.]

13. [Mother's] Exhibits 9, 10, [and] 11 are account statements for the business account and indicates this account regularly maintained an average balance well in excess of $400,000.00.

14. The ISB account statements cover the time frame from [December 25, 2019] through [July 25, 2022]. The beginning balance of this account on the December 25,

2019 statement was $470,505.97. The beginning balance on the July 25, 2022 statement was $532,926.55.

15. A review of the ISB statements reveal what appears to be a variety of personal spending using the "business" checking account.

16. The personal expenditures paid from the account included the following: daycare, PlayStation, Rite Aid, groceries, Dish [(cable)], Nason Hospital, dental care, UPMC, baseball savings, Keto [s]upplements, Spring House Greenhouse, Gerber life, Texas Roadhouse, Red Lobster, La Fiesta, Redbox, liquor and surfside fitness in Sea Isle, [New Jersey].

17. On a monthly basis[,] the three vehicle loans and two mortgages are paid from [the ISB] account which totals payments of $5,576.64/month or an annual total of $66,919.68.

18. Father has recently undertaken home renovations that include: "taking out some walls" and installing new flooring and carpet.

19. Father is married and his wife earns an annual salary of $74,000.00 ([Father's] Exhibit 3, line [one]) and he shares household expenses with her.

20. Father testified he never takes a draw from this business.

21. Father has the ability to control the retention or disbursement of funds by the business.

22. Father testified that he pays his father "under the table" and has no other employees or partners so he controls the workflow and volume of his business.

Trial Court Opinion, 5/31/24, at 2-4. Based upon all of the foregoing, the trial court determined that

Father has income available to him from business profits. These earnings could be formally taken by Father as income rather than being informally used as has been the case. Therefore, the [c]ourt will impute a gross income for Father based on the circumstantial evidence of the availability of business earnings.

The [c]ourt assigns to Father a gross annual income in the amount of $125,000.00 with a tax calculation deduction for that figure. This amount is a conservative estimate. However, this gross income should result in a net income that supports the spending patterns of the retained earnings and the circumstantial cash flow of the business.

The [c]ourt notes that it is not establishing an earning capacity for Father, but rather imputing an estimate of Father's actual earnings from his business. The [c]ourt does not find Father's stated income to be credible based on his spending as set forth in the record. The [c]ourt used the evidence of Father's payment or expenses and accumulation of wealth to circumstantially impute a net monthly income. The [c]ourt is aware that the actual earnings of Father may in fact be greater than [its] estimate, but [Father's actual earnings are] unlikely to be less.

*Id.* at 6-7. In light of the trial court's order, a subsequent order was issued on June 28, 2024, directing Father to pay Mother $919.00 per month, effective May 21, 2021. The order also set arrears at $17,111.63. This appeal followed.

Father raises the following issues for our consideration.

1. Did the trial court err and/or abuse its discretion in determining [Father] to have an earning capacity of $125,000[.00] gross annually which is substantially greater than reflected on [Father's] tax returns and against the uncontroverted testimony of [Father's] expert accountant as to [Father's] net disposable income?

2. Did the trial court err and/or abuse its discretion in failing to consider [Father's] business being affected by [the COVID-19] pandemic and the resulting decrease and fluctuation of his income?

3. Did the trial court err and/or abuse its discretion in utilizing [Father's] accumulated assets and obligations obtained prior to 2021 through his combined income and savings with his wife's income in determining his earning capacity?

Father's Brief at 7 (unnecessary capitalization omitted).

- 5 -

Father's issues, *in toto*, challenge the trial court's child support order (in particular, the imputed estimate of Father's actual income) for which our standard of review is well established.

> When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of [] discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the [trial] court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill[-]will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Silver v. Pinskey*, 981 A.2d 284, 291 (Pa. Super. 2009) (*en banc*) (citation omitted).

> Moreover, it is within the province of the trial court to weigh the evidence and decide credibility[,] and this Court will not reverse those determinations so long as they are supported by the evidence.

*Brubaker v. Brubaker*, 201 A.3d 180, 184 (Pa. Super. 2018) (citation omitted), *appeal denied*, 216 A.3d 225 (Pa. 2019). "Support orders must be fair, non-confiscatory[,] and attendant to the circumstances of the parties." *Spahr v. Spahr*, 869 A.2d 548, 552 (Pa. Super. 2005) (citation and original quotation marks omitted).

Pursuant to Section 4322(a) of the Domestic Relations Code,

> Child and spousal support shall be awarded pursuant to a Statewide guideline as established by general rule by [our]

Supreme Court, so that persons similarly situated shall be treated similarly. The guideline shall be based upon the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support. In determining the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support, the guideline shall place primary emphasis on the net incomes and earning capacities of the parties, with allowable deviations for unusual needs, extraordinary expenses[,] and other factors, such as the parties' assets, as warrant special attention. The guideline so developed shall be reviewed at least once every four years.

23 Pa.C.S.A. § 4322(a).

Pursuant to the support guidelines, an obligation to pay child support is, generally, based on the parties' monthly net incomes, which are calculated using at least a six-month average of each party's income, including, *inter alia*, wages, bonuses, **net income from a business**, rents, pension plan distributions, and income from a trust. Pa.R.Civ.P. 1910.16-2(a) (emphasis added). In arriving at a party's "monthly net income," the following withholdings and payments are deducted from the party's monthly gross income: federal, state, and local income taxes; unemployment compensation taxes and local services taxes; Federal Insurance Contributions Act payments (Social Security, Medicare, and Self-Employment taxes) and non-voluntary retirement payments; mandatory union dues; and alimony paid to the other party. **See** Pa.R.C.P. 1910.16-2(c)(1).

With respect to business income, this Court has held:

When a payor spouse owns his own business, the calculation of income for child support purposes must reflect the actual available financial resources of the payor spouse. Further, all benefits flowing from corporate ownership must be considered

- 7 -

in determining income available to calculate a support obligation.

***Spahr***, 869 A.2d at 552 (citations and original quotation marks omitted). Additionally,

> [o]ur jurisprudence is clear, therefore, that the owner of a closely-held corporation cannot avoid a support obligation by sheltering income that should be available for support by manipulating salary, perquisites, corporate expenditures, and/or corporate distribution amounts. By the same token, however, we cannot attribute as income funds not actually available to or received by the party.

***Fennell v. Fennell***, 753 A.2d 866, 868 (Pa. Super. 2000).

Upon review, we discern no abuse of discretion on the part of the trial court. We note, initially, that there is ample record support for the trial court's finding that "Father has income available to him from his business profits" and that, these "earnings could be formally taken by Father as income," as it is "informally used" by Father. Trial Court Opinion, 5/31/24, at 6. The ISB account, as testified to by Father, reflects the profits of his company, as accumulated over the past 17 years. Father testified, on multiple occasions, that he uses the ISB account as his personal account and takes funds "as needed." N.T. Hearing, 5/14/24, at 42; ***see also id.*** at 79-80.

In addition, we believe that the evidence presented at the May 14, 2024 hearing reflected that Father's business was, for all intents and purposes, very successful, even despite his testimony that there had been a recent downturn due to the COVID-19 pandemic. More specifically, Father admitted that the ISB account consistently maintains a steady balance of over $400,000.00. ***Id.***

at 80. Moreover, Father's accountant, Mr. Creppage, opined that such a steady balance was evidence of a successful business. The relevant exchange is as follows:

QUESTIONS OF BERNARD CREPPAGE BY THE HON. JOLENE GRUBB KOPRIVA

Q: … Just a quick question for you[], somewhat of a hypothetical, and this is not necessarily that you know the full picture of [Father] because you just deal with his business and tax returns, correct?

A: Correct.

Q. And you do [not] give him financial advice at all?

A. Correct.

Q. So hypothetically, if someone has a business for [17] years and has $400,000[.00] sitting in their bank account on average pretty regularly, that would be about $23,500 saved annually if you averaged it out over that period of time, is that right? Do I have my math right?

A. You would have to give me numbers again but times $20,000.00 is four hundred grand.

Q. So, [$23,500.00], if you [have] $400,000[.00] sitting in the bank that is available to you and you have been saving that for 17 years or accumulating that, the average annual a year would be 23,500 of savings?

A. Correct.

Q. Do you see that happen very often in business?

A. Well it just depends. I mean some businesses are very successful. So, yes, we see it on the very successful businesses and some people save it in different methods. They do [not] necessarily put it in a checking account. They might put it in a retirement plan. So some businesses, no, because they are not successful. So it just depends on how successful the business is to be honest. For example, a lot of people have 401(k) plans

and they can defer over [$20,000.00] a year into a 401(k) plan. So certainly, yes, we do see that.

Q. So if somebody has been able to do that, you would determine generally that to be a successful business?

A. Well certainly it provides the ability to defer that cash, to accumulate that much cash over those years. You know, it [is] all relative to whether you consider that successful or not.

Q. That's fair.

A. I do [not] know what debts they have and things like that.

Q. Correct. But to an accountant, just generally speaking, that would indicate that there is either – they're not paying their mortgage or they're paying everything and there is still [$]23,500[.00] annually to the good on average?

A. Right. We would generally look at the entire balance sheet to see not just cash but what other assets and liabilities they have to see about success.

*Id.* at 105-107.

Finally, we find record support for the trial court's determination that Father's lifestyle could not be sustained based upon his stated income. At the hearing, Father testified that he owns three separate properties: his business property, his marital home, and a rental property in James Creek, Raystown, Pennsylvania. The value of these three properties totals approximately $1,006,500.00. *Id.* at 65. Father testified that the marital property's mortgage was approximately $1,570.00, but he owned the business property outright. *Id.* at 73. With respect to the rental property, Father testified that the purchase price was $512,000.00 and further confirmed that the initial loan with respect to this property was $461,000.00. *Id.* at 65. While Father claimed that he did not pay any out-of-pocket expenses to receive the

- 10 -

aforementioned loan, Father refused to answer how the $50,000.00 difference between the purchase price of the rental property and the principal of the acquisition loan was satisfied, even when specifically questioned by the trial court. *Id.* at 58 and 67-69. Moreover, Father admitted that the mortgage on the rental property was $2,738.70 (totaling approximately $32,000 a year) and the mortgage was likely to increase. *Id.* at 66. While Father maintained that renters paid for the mortgage at the rental property, Father also claimed that he was "losing money" on the property and that he still covered utilities, as well as the full mortgage during the winter months because the property could not be rented out, leaving a gap of a "few thousand dollars." *Id.* at 66-67; *see also id.* at 89. In addition, Father testified that he owned a 2016 Silverado truck, a 2015 Silverado pick-up truck, and that his wife drove a Cadillac Escalade. *Id.* at 74-76. Finally, Father testified to undertaking a large number of improvements to his martial home. Based upon all the foregoing, we conclude that the trial court did not abuse its discretion in finding that, even considering Father's wife's steady income, Father could not maintain his lifestyle based upon the "net cash flow" available to him. *See id.* at 100-101 (Mr. Creppage testifying: Father's "net cash flow" in 2021 was $6,482.00; Father's "net cash flow" in 2022 was $16,873.00; and Father's "net cash flow" in 2023 was $7,422.00.).

Based upon all of the foregoing, we affirm the trial court's July 14, 2024 order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/22/2025